**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| FRED LLOYD HOLDER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. CIV-02-556-FHS |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

On June 6, 2005, the Tenth Circuit Court of Appeals reversed and remanded this action for an evidentiary hearing and reconsideration of the ineffective assistance of counsel claim asserted in the motion to vacate filed under 28 U.S.C. § 2255 by Petitioner, Fred Lloyd Holder ("Holder"). An evidentiary hearing was held on March 14, 2006, with Holder presenting the testimony of his trial counsel, Hack Welch ("Welch") and Vester Songer ("Songer").[1] Numerous exhibits were also admitted at the hearing. The parties have filed post-hearing findings of fact and conclusions of law, and briefs in support of such findings and conclusions. Having thoroughly considered the testimony, exhibits, and submissions before it, the Court concludes Holder's motion to vacate should be granted as Holder was denied his Sixth Amendment right to the effective assistance of trial counsel due to (1) his counsel's failure to make an informed decision about whether to call a corroborating eye-witness to testify at trial and (2) his counsel's failure to consult with and/or employ expert witnesses in

---

[1] Holder is currently represented by Stephen Jones, who entered an appearance on behalf of Holder in the underlying criminal case on July 3, 2000.

1

an attempt to counter the government's experts in the areas of forensic pathology, forensic serology, crime scene reconstruction, and trajectory of bullets.

**Procedural Background**

On September 23, 1999, Holder, a cattle rancher in Choctaw County, Oklahoma, shot and killed David Jeffery Pickens ("Pickens"), a partner in B.C. Wetlands, a partnership which purchased land adjacent to the family property managed by Holder.[2] Holder was charged in the District Court of Choctaw County with first degree murder, in violation of 21 Okla.Stat. § 701.7(A), and was released on $25,000 bail. Some four months later, on January 13, 2000, Holder was charged by a federal grand jury in the Eastern District of Oklahoma in a two-count indictment with (1) a violation of 18 U.S.C. §§ 1111(a) and 114(1) for the murder of Pickens while Pickens was assisting Kenneth Swift ("Swift"), a federal employee, in the performance of his official duties and (2) a violation of 18 U.S.C. § 111 for assaulting, resisting, or impeding a federal officer, Swift, while in the performance of his official duties. On March 9, 2000, Holder was convicted by a federal jury of the lesser included offense of second degree murder. The jury also convicted Holder of the 18 U.S.C. § 111 charge. On November 14, 2000, the Court sentenced Holder to a term of 168 months on the second degree murder conviction and to a term of 60 months on the 18 U.S.C. § 111 conviction, each to run concurrently.[3]

---

[2] The B.C. Wetlands partners were a group of landowners from the Sherman/Denison, Texas, area. They purchased the property with the intent of managing it as a wildlife habitat and for duck hunting.

[3] Holder was also sentenced to concurrent terms of supervised release of 60 and 36 months.

Holder's convictions were affirmed on appeal by the Tenth Circuit Court of Appeals on July 10, 2001. United States v. Holder, 256 F.3d 959 (10th Cir. 2001). On October 8, 2002, Holder filed a motion to vacate his convictions under 28 U.S.C. § 2255 alleging ineffective assistance of counsel. This Court denied Holder's motion to vacate on September 29, 2003. On June 6, 2005, the Tenth Circuit reversed this Court's order denying Holder's motion to vacate under section 2255 and remanded this action for an evidentiary hearing and reconsideration of Holder's motion on his claim for ineffective assistance of counsel. United States v. Holder, 410 F.3d 651 (10th Cir. 2005). Holder's motion rests on four allegations of ineffective assistance of counsel: (1) counsel's failure to call an eye-witness at trial; (2) counsel's presentation of a "nonsensical" and "jumbled" closing argument; (3) counsel's lack of preparation and investigation, including the failure to file pretrial motions and raise jurisdictional and venue issues; and (4) cumulative error.

**Factual Background**[4]

The B.C. Wetlands property was burdened with an easement in favor of the United States, through the United States Department of Agriculture ("Department"). This easement gave the Department and its branch, the Natural Resources Conservation Service ("Service"), substantial control over the property for the purpose of restoring, protecting, managing, and enhancing it as a wetlands. One of the conditions of the federal government's easement was the prohibition

---

[4] The Tenth Circuit's previous opinions on Holder's appeals have set forth a detailed recitation of the underlying facts. See Holder, 256 F.3d at 960-63 and Holder, 410 F.3d at 653-54. It is not necessary to repeat those facts, but rather, this Court will provide a sufficient factual background to support its analysis of Holder's ineffective assistance of counsel claim.

3

against grazing or allowing livestock on the property.  It was the responsibility of the B.C. Wetlands group to assure the terms of the easement were met with respect to the removal of livestock from the property.  From the inception of their ownership interest, the B.C. Wetlands group had to deal with the persistent problem of cattle wandering onto their property from the land managed by Holder.  Numerous informal resolutions of this problem with Holder were attempted by B.C. Wetlands to no avail.  The problem persisted with altercations occurring and accusations passing back and forth between B.C. Wetlands and Holder as to the source of the problem.  The cattle continued to find their way onto the B.C. Wetlands property with a concomitant tension building between the parties.  Due to the recurring problem with Holder's cattle wandering onto the B.C. Wetlands property, the Service eventually authorized the federally funded construction of a fence within the easement property for the purpose of securing the property.

To this end, on September 23, 1999, Pickens was flagging fence line on the property with Swift, a Service District Conservationist, who was responsible for the administration of wetlands projects in southeastern Oklahoma.  Pickens and Swift had finished flagging a section of the fence line and were moving on to a new section of fence when they encountered Holder and one David Smith ("Smith")[5] near the boundary between the two properties.  Pickens and Swift were on foot after having traveled to the area by four-wheeler.  A rifle was present in plain view in the four-wheeler.  Holder and Smith were on horseback and, according to

---

[5] Before the grand jury, Smith testified he lived about four miles from Holder and had known Holder "all of his life."  Holder's Exhibit 3, Smith's Grand Jury Testimony at 3.  Smith further testified that he and Holder were "not close friends" and "[w]e don't socialize or go anywhere together, our families don't."  Id.

4

Holder's trial testimony, had been hunting wild hogs that morning. Holder was holding a shotgun.

As the two parties approached each other, Pickens, anticipating trouble based on past encounters with Holder, moved ahead of Swift to intercept Holder and Smith. Pickens told Swift to stay behind because there might be trouble. As he moved ahead of Swift, Pickens undid his belt, repositioned his holster, moved his holstered .22 pistol from his side to the central part of the small of his back, and replaced his belt. Pickens continued walking and approached Holder and Smith at the fence line near where the four-wheeler was located. Swift remained back approximately 20 to 30 feet from Pickens in the tall weeds. Swift testified at trial that Holder had the shotgun pointed at Pickens in the area of Pickens' head and chest. A heated exchange of words took place between Holder and Pickens. At some point during this brief exchange, Pickens placed his hands on his hips. Pickens then reached for the pistol tucked into his waistband around his back. Swift testified that as Pickens fumbled for the pistol[6] he heard Holder say, "I told you never pull a gun on me again." Holder's Exhibit 1, Swift's Trial Testimony at 378. Holder then fired the single shot that killed Pickens.

During the trial, Holder testified in his own defense and gave a conflicting version to that offered by Swift as to the key issue of whether Pickens had been able to remove his pistol from his holster before Holder fired his shot. Holder testified that after he saw Pickens move his hand from his hips, he told Pickens,

---

[6] Swift's testimony was "[h]e could have partially got it out. He never got it out of the holster, but he could have got it partially drawn." Holder's Exhibit 1, Swift's Trial Testimony at 382.

5

"[f]ellow, don't you go for that gun." Holder's Exhibit 1, Holder's Trial Testimony at 673. Holder testified he "jacked a shell into the shotgun" and saw Pickens' pistol come out of his holster. Id. at 673-74. Holder testified he then shot Pickens because he thought Pickens was going to shoot him first. Id. at 674.

Smith, the other eye-witness to the shooting, was not called to testify at trial. Smith did, however, testify before the grand jury. Although there are minor discrepancies between Smith's grand jury testimony and Holder's trial testimony, on the central issue of whether Pickens pulled his gun before Holder shot him, Smith's testimony supports Holder's version of the events. In this regard, Smith testified before the grand jury:

> And then right after that, just kind of as soon as he said, no, I didn't, I seen him reach with his right hand back. And then there was a little bit of a hesitation, I don't know what, and then he jerked out a gun, I don't know if his arm was extended. And just as soon as he jerked it out -- it all happened just like that -- Fred shot. It just happened just like that.

Holder Exhibit 3, Smith's Grand Jury Testimony, at 55-56.[7] Smith

---

[7] Smith's grand jury testimony is consistent with the interview statements of Smith prepared by the Oklahoma State Bureau of Investigation ("OSBI") following interviews of Smith on September 24, 1999, and October 1, 1999. The September 24, 1999, OSBI interview reports Smith as stating Pickens "pulled his hand out from behind his back with a pistol in his hand." Holder Exhibit 4, September 24, 1999, OSBI Interview of Smith at 2. The October 1, 1999, OSBI interview reports Smith as stating he saw Pickens "reach behind his waist, real slow, with his right hand. Smith did not see a gun or a holster on Pickens. When Pickens' hand came back around, he was holding a gun. Pickens had the gun pointed in Holder's direction." Holder Exhibit 5, October 1, 1999, OSBI Interview of Smith at 2.

also testified that it was his belief that "if Fred hadn't have fired, he could have been the one dead and maybe me too." Id. at 73.

On March 6, 2000, Holder's trial commenced. Holder was represented at trial by Welch and Songer. Welch had been retained to represent Holder on the initial state court murder charge and his representation continued when Holder was indicted in federal court. On February 22, 2000, Songer entered an appearance on behalf of Holder. Songer was to assist Welch, who would serve as lead counsel in the case. Although neither Welch nor Songer had ever tried a federal homicide case, they were both experienced trial attorneys before the state and federal courts in civil and criminal matters alike and had, heretofore, enjoyed reputations before this Court of being well-prepared and tenacious trial lawyers. Contrary to this Court's perception of Welch's abilities, both in prior cases and the instant case, Welch testified at the evidentiary hearing that he felt uncomfortable, inhibited, and intimidated in federal court.

Welch, with the concurrence of Songer, made the decision not to call Smith as a witness. Welch discussed this decision with Holder on more than one occasion. Holder did not agree with the decision of his counsel to not call Smith to testify at trial. Of the three eye witnesses to the shooting - Smith, Swift, and Holder - Smith was the only one to not take the stand and testify at trial. Although Welch and Songer believed Smith would have made a great witness on behalf of Holder given the consistencies between their accounts of the shooting, Welch and Songer decided not to call Smith based on their belief that the Government would be able

7

to connect Holder to Smith's 1992 federal marijuana convictions.[8] Welch also testified he should have reconsidered this decision to not call Smith after Holder testified, in Welch's opinion, very poorly.  Because of his lack of confidence and uneasiness in federal court, Welch testified he made decisions more hastily during federal court trials.  Welch testified that his inhibitions and desire to just get the trial over affected his decision on whether to call Smith as a witness after Holder's testimony.

Welch and Songer both testified that if they had believed there was no connection between Holder and Smith's 1992 federal marijuana conviction, they would have called Smith to testify at trial.  Their belief that there was a connection, however, was not based on verifiable facts ascertained through a thorough investigation on their part.  The reality of the situation was that both Welch and Songer failed to properly investigate whether the Government would be able to tie Holder to Smith's 1992 federal marijuana conviction.  Welch and Songer assumed there was a connection based on discovery provided to them by the Government concerning Smith's 1992 conviction and a 1993 investigation of Holder for marijuana cultivation on a separate piece of property.  Rather than test this assumption, Welch and Songer persisted in their belief of a connection and failed to call an eye-witness to the shooting who could, in all important respects, verify their client's account of a shooting in self-defense.

The decision to not call Smith was clearly not an informed decision on the part of Welch and Songer.  Prior to trial, Holder informed Welch that he had no involvement with Smith's marijuana

---

[8] Having served his sentence on his 1992 conviction, Smith was available to testify at Holder's trial and, in fact, had been subpoenaed by defense counsel.

8

operation.[9] Welch was either not aware of, or failed to distinguish, the fact that Smith's 1992 conviction and the 1993 investigation of Holder were a year apart. Welch admitted that his failure to recognize this distinction was the result of his hurriedly looking over the discovery material. Welch had a vague recollection that Holder was seen in the field where the Government claimed Smith was cultivating marijuana yet he failed to request the video surveillance the Government possessed of Smith's fields.[10] Welch did not dispute the fact that such surveillance would have identified another individual and not Holder. Welch also failed to learn more about Smith's 1992 conviction by either talking to Smith's lawyer or researching the case. Had he researched Smith's case he would have learned that on appeal to the Tenth Circuit, Smith's conspiracy conviction was overturned due to the Government's failure to offer proof of any other coconspirators in his marijuana cultivation.[11] Finally, Welch admitted that he did

---

[9] Welch testified he did not recall whether he had asked Smith about Holder's involvement in the marijuana operation, but if he did, Smith likewise denied any involvement by Holder.

[10] Songer mistakenly believed Smith's cultivation of marijuana took place on Holder's property. Songer testified that had he determined Smith's cultivation did not take place on Holder's property, he would have agreed with a decision to call Smith to testify notwithstanding the fact that Smith was a convicted felon.

[11] Smith's conspiracy conviction was overturned in United States v. Bailey, 13 F.3d 407 (10th Cir. 1993)(Table), 1993 WL 525667, cert. denied, 114 S.Ct. 2139 (1994). In that appeal, the Tenth Circuit also reversed the convictions against Smith's alleged coconspirator Robert Troy Bailey ("Bailey"), due to insufficient evidence of any conspiratorial relationship between Smith and Bailey to manufacture marijuana on Smith's property (or property owned by Smith's mother and under Smith's control). Id at 3-5. The Tenth Circuit also found no evidence in the record of any conspiratorial relationship between Smith and unknown coconspirators, a finding which would tend to exclude Holder as having been involved with Smith. Id. at 5.

9

not research the issue of the admissibility of evidence of the alleged connection between Holder and Smith's 1992 marijuana cultivation conviction. Instead, Welch blindly assumed the connection and failed to seek a pretrial ruling to determine the admissibility of such evidence.

At trial, the Government attempted to corroborate Swift's version of the events through the presentation of expert testimony from a forensic pathologist/medical examiner for the State of Oklahoma and an OSBI criminalist. These experts testified in the areas of forensic pathology, forensic serology, crime scene reconstruction, and trajectory of bullets. The Government offered their testimony in an attempt to establish, among other things, the following key points: that someone had moved Pickens' hands after the shooting; that Pickens' pistol was likely not in a raised position when he was shot; that Pickens' pistol was likely in his holster when he was shot; and, assuming Pickens did have his pistol in his hand when he was shot, that the pistol would have dropped straight down to the ground and it would not have been found near the fence where Holder claimed to have retrieved it. Despite being confronted with such expert testimony, Welch did not consider testing the validity of the opinions offered by the Government. Moreover, despite his belief that testimony in these areas would be relevant to Holder's assertion of self-defense, Welch did not consult with or utilize the services of any expert to test the Government's theories or determine whether any expert testimony would be beneficial to Holder's defense. Welch candidly testified that the reason he did not even consider whether expert testimony was necessary or helpful was because of his own lack of expertise in that area.

**Analysis**

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This constitutional right to counsel has long been recognized as "the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970). The Sixth Amendment's guarantee of counsel "exists, and is needed, in order to protect the fundamental right to a fair trial." Strickland v. Washington, 466 U.S. 668, 684 (1984). Our adversarial system functions in a constitutional manner when effective counsel is provided to defendants because "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution.'" Id. at 685 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 275-76 (194).

In Strickland, the Supreme Court addressed the standard for analyzing claims of ineffective assistance of counsel. In formulating the standard, the Supreme Court noted "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. In order to assure a just result and fair trial, the Supreme Court set forth the now familiar two-part test governing ineffective assistance of counsel claims. Id. at 688-89. Specifically, a defendant claiming his counsel was ineffective must demonstrate that (1) the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defense. Id. at 667. A defendant has the burden of proving the deficiency and prejudice

11

prongs of the Strickland standard.  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).  Failure to establish either prong of the Strickland standard will result in a denial of a defendant's Sixth Amendment claim.  Strickland, 466 U.S. at 696.

The first part of this test, the deficiency component, requires a showing that trial counsel committed errors that were so deficient that the performance failed to meet the standard of "counsel" required under the Sixth Amendment.  Id. at 687.  There must be a showing "that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Counsel's performance must fall below an objective standard of reasonableness under prevailing professional norms.  Id. at 687-88.  While "[j]udicial scrutiny of counsel's performance must be highly deferential," id. at 689, the Court remains cognizant of the fact that a defendant is entitled to "the 'exercise' [of] the skill, judgment and diligence of a reasonably competent defense attorney."  United States v. Burney, 756 F.2d 787, 790 (10th Cir. 1985)(quoting Dyer v. Crisp, 613 F.2d 275, 279 (10th Cir.)(en banc), cert. denied, 445 U.S. 945 (1980)(alteration in original).  The Court evaluates counsel's performance from counsel's "perspective at the time of that performance, considered in light of all the circumstances."  Median v. Barnes, 71 F.3d 363, 368 (10th Cir. 1995).  The second part of the Strickland test, the prejudice component, demands proof that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Reasonable probability is defined as "probability sufficient to undermine confidence in the outcome."  Id.

The primary argument asserted by Holder in support of his

12

ineffective assistance of counsel claim is that he was prejudiced by the failure to call Smith, a witness who would have testified, consistent with this grand jury testimony, that Holder acted in self-defense when he shot and killed Pickens.  Holder contends the decision not to call Smith was uninformed; consequently, it cannot be considered discretionary trial strategy.  Holder argues Welch and Songer failed to call Smith to testify based on an unsupported belief that the Government could link Holder to Smith's 1992 federal marijuana conviction.  Holder vigorously asserts that counsel's failure to investigate the alleged marijuana cultivation connection and/or their failure to seek a pretrial ruling on the admissibility of any such evidence constitutes constitutionally deficient performance on the part of counsel which operated to their prejudice under the Sixth Amendment standards of Strickland.  The Court agrees.

 The decision whether to call a particular witness rests within the sound discretion of trial counsel. Jackson v. Shanks, 143 F.3d 1313, 1320 (10th Cir. 1998).  A strategic decision of this sort is "virtually unchallengeable" provided it is made after "a thorough investigation of law and facts." Strickland, 466 U.S. at 690.  The discretion afforded trial counsel in this regard is not without bounds, however, as "it is the *informed, tactical* decision that is within counsel's discretion." United States v. Holder, 410 F.3d 651, 655 (10th Cir. 2005).  Trial counsel's decision whether to call a witness "made after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations." Strickland, 466 U.S. at 691.  Thus, trial counsel is obligated to make a reasonable investigation of the facts and law surrounding the decision to call a witness or "make a reasonable decision that makes particular investigations unnecessary." Id. and see Fisher

v. Gibson, 282 F.3 1282, 1292 (10th Cir. 2002)("Reasonably professional performance includes a duty by counsel to investigate all lines of defense or make reasonable determinations that such investigation is unnecessary.").

In this case, Welch and Songer testified the only reason for not calling Smith to testify at trial was their fear that the Government would be able to connect Holder to Smith's 1992 marijuana conviction. Welch candidly admitted his failure to investigate the existence of any such connection and whether any evidence supporting a connection would have been admissible at trial.[12] Welch and Songer just assumed a connection based on their cursory review of the discovery provided by the Government. The record before the Court does not establish, much less suggest, that there was any connection between Holder and Smith's marijuana cultivation. Apparently, this information was available to Welch and Songer from a rudimentary examination of the discovery provided by the Government. Moreover, a simple review of Smith's reported federal case would have suggested the absence of any evidence connecting Holder to Smith on the 1992 conviction. Welch offers no justification for his failure to distinguish Smith's 1992 marijuana activities from the investigation into Holder's alleged marijuana activities in 1993. Rather, Welch candidly admits his lack of diligence and failure to investigate a key component of his client's defense. Additionally, Welch admits his representation was deficient due to his failure to file a motion in limine seeking a pretrial ruling on the admissibility of any marijuana cultivation evidence.

---

[12] Given the division of labor between Welch and Songer, and Welch's role as lead counsel, it appears to have been Welch's task to conduct an investigation of this sort. Songer acted in an advisory role concerning such tactical decisions.

Smith's grand jury testimony was consistent with Holder's trial testimony on the key issue of whether Pickens pulled his pistol on Holder prior to Holder shooting. Smith testified Pickens reached for his pistol and jerked it out before he was shot by Holder. Holder's Exhibit 3, Smith's Grand Jury Testimony at 55-56. Smith's testimony at trial - assuming a consistency with his grand jury testimony - would undoubtedly have been powerful, corroborating evidence of a shooting in self-defense. As this prosecution boiled down to a quintessential swearing match between Holder and Swift (as buttressed by the Government's expert testimony)[13], counsel's failure to present Smith's corroborating eye-witness testimony, combined with counsel's failure to seek a pretrial ruling on the admissibility of the aforementioned marijuana cultivation information, constitutes ineffective assistance of counsel. See Chambers v. Armontrout, 907 F.2d 825 (8th Cir.)(decision to not call at trial only witness who would have supported theory of self-defense constituted ineffective assistance of counsel), cert. denied, 498 U.S. 950 (1990). The Court finds that Holder has satisfied both prongs under Strickland by showing (1) counsel's representation regarding the decision whether to call Smith to testify was deficient in that it was not reasonable under prevailing professional norms, Strickland, 466 U.S. at 667, and (2) this failure to call Smith to the stand at trial prejudiced Holder in that there is a reasonable probability that, but for counsel's

---

[13] The Government prosecutor admitted as much in his closing argument when he stated "[l]adies and gentlemen, this case really does boil down to this. Do you believe Ken Swift or do you believe the defendant?" Holder's Exhibit 1, Jury Trial Transcript at 832-33. The prosecutor then highlights Holder's failure to present corroborating evidence when he states "[a]ll that has ever been done by the defendant to corroborate their story is given pictures of him being a hunter, a hunter going out and killing wild boars. That's the only physical evidence you have." Id. at 842.

15

deficiencies, the results at trial would have been different. Id. at 694.

Understandably, Holder's focus, as well as the Court's, has primarily been on the effect of counsel's failure to call Smith as a witness in the context of the murder conviction. This analysis, however, likewise applies to Holder's conviction for assaulting, resisting, or impeding a federal officer under 18 U.S.C. § 111. A review of Smith's grand jury testimony reveals a version of the events following the shooting that corroborates Holder's version that he, Holder, only initially prevented Swift from seeking assistance due to the presence of the rifle in the four-wheeler. Holder's Exhibit 3, Smith's Grand Jury Testimony at 60-61. Smith also testified he didn't remember whether Holder had his gun pointed at Swift as Swift walked down the fence line towards the four-wheeler. Id. at 64.[14] Given this corroborating testimony, the Court finds there is a reasonable probability that had Smith testified at trial, the results with respect to the 18 U.S.C. § 111 charge would have been different. Thus, the Court concludes the deficiency and prejudice components of Strickland are satisfied as to both of the counts charged in the indictment.

This constitutionally deficient decision to not call Smith to testify was further exacerbated by counsel's failure to consult with and/or employ expert witnesses to counter the government's expert testimony from the State of Oklahoma forensic pathologist and OSBI criminalist. As noted, the testimony of the government's experts buttressed the government's theory (and Swift's testimony) that Holder shot Pickens with the necessary *mens rea*. Neither

---

[14] Holder testified at trial that he has his gun pointed "in a general direction towards [Swift]." Holder's Exhibit 1, Holder's Trial Testimony at 676.

16

Welch nor Songer ever attempted to determine if there was a legitimate basis for the findings of the government's experts. Rather, they simply relied on cross-examination of the government's experts as the means for testing the validity of the experts' findings. Welch admitted he lacked any expertise in these areas. Welch further admitted that it was crucial in the formulation of Holder's defense to determine whether the findings of the government's experts were legitimate. Despite this belief, counsel for Holder did not consult with or hire any expert to test the government's case. A failure of this magnitude with respect to issues so central to the presentation of a defense of self-defense is inexcusable and seriously "undermine[s] the proper functioning of the adversarial process." Strickland, 466 U.S. at 686. Consequently, the Court finds that counsel's failure to consult with and/or employ expert witnesses to test the legitimacy of the findings offered by the government's experts constitutes ineffective assistance of counsel.

Holder also asserts Welch and Songer were deficient in other respects - failure to conduct an adequate pretrial investigation, failure to raise jurisdictional and venue issues prior to trial, failure to contest the Court's denial of bond, failure to adequately prepare Holder to testify, failure to vigorously challenge cross-examine Swift, failure to file any post trial motions, and the presentation of a "nonsensical" and "jumbled" closing argument. The Court has considered the facts and arguments presented by Holder relevant to these claims, but finds no basis for a finding of ineffective assistance of counsel on these additional grounds.

**Conclusion**

The Sixth Amendment right to the effective assistance of counsel is designed to afford those accused of crimes with a fundamentally fair trial. To this end, defendants are entitled to the assistance of counsel who exhibit the requisite skill, knowledge, and diligence to meaningfully test the prosecution's case. When counsel's performance is constitutionally deficient in the sense that the adversarial process has not functioned in a manner assuring a just result or fair trial, relief under section 2255 is warranted. Notwithstanding their well-deserved reputations as seasoned criminal defense lawyers, Welch and Songer failed, in this case, to meet the standard of "counsel" guaranteed by the Sixth Amendment. Counsel's failure to make an informed decision about whether to call Smith to testify at trial and their failure to consult with and/or employ expert witnesses constitutes ineffective assistance of counsel under Strickland. Consequently, Holder's motion for relief under section 2255 is granted and Holder's convictions are ordered vacated. The Clerk of the Court is directed to file a copy of this order in Holder's criminal case, No. CR-00-02-S, and this matter is set for a status hearing at 2:00 p.m. on July 12, 2006, for the purpose of setting a new trial date in the criminal case.

It is so ordered this 21st day of June, 2006.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma